*In re* MARRIAGE OF JOSEPH F. FREDERICK, JR., Petitioner-Appellee, and JOANNE A. FREDERICK, Respondent-Appellant.

Second District No. 2—90—0659

Opinion filed September 4, 1991.

Lawrence S. Starkopf and William H. Hrabak, both of Feiwell, Galper & Lasky, Ltd., and Murphy & Boyle, Chartered, both of Chicago (George S. Feiwell, of counsel), for appellant.

Amy L. Gertler, of Grund, Marcus, McNish, Knabe & Nadler, of Chicago (David I. Grund, of counsel), for appellee.

JUSTICE NICKELS delivered the opinion of the court:

Following a hearing in the circuit court of Lake County, a judgment for dissolution of marriage was entered on October 2, 1989, whereby the marriage between petitioner, Joseph F. Frederick, and respondent, Joanne A. Frederick, was dissolved. Pursuant to respondent's motion to reconsider, the judgment was subsequently amended. Petitioner was awarded custody of the parties' minor son. The marital home with net equity of $219,000, initially awarded to petitioner, was to be sold upon the son's graduation from high school, and the net proceeds divided equally between the parties. The marital portion of petitioner's pension plan valued at $372,000 was divided equally; 5,716 shares of Hilton stock valued at $600,180 was divided 60% to respondent, 40% to petitioner. By stipulation petitioner was awarded a $17,000 thrift savings plan, and respondent received a 1988 Toyota Celica. The trial court retained jurisdiction to allocate the profits realized from the exercise at petitioner's discretion of 6,772 vested Hilton stock options and 11,000 nonvested stock options to be divided equally between the parties. Petitioner was to pay the college expenses of the parties' daughter and to pay respondent $2,500 per month in maintenance. Each party was to retain the personal property in his or her possession with the exception of certain personal property awarded to respondent. Respondent had

sought to set aside a certain trust called the "Maine Trust" (Maine Trust) based upon fraud, duress or coercion and have the trust *res*, a house and 82 acres in Maine valued at $160,000, apportioned as marital property. The court refused to strike down the trust. Respondent raises four issues on appeal.

Petitioner, presently 56 years old, and respondent, presently 55 years old, were married in 1955. Their daughter, Joelle, was born in 1968, and their son, Joseph III, was born in 1972. Petitioner was a senior vice-president for the Hilton Hotels in the Midwest region and had worked for the Hilton Hotels Corporation for 33 years. For nearly 17 years of the parties' marriage, the family lived in the Hilton hotels at which petitioner was assigned to work as general manager. They had available to them maid service, housekeeping, restaurants, health clubs and other hotel amenities afforded to them by Hilton. Respondent worked at part-time jobs at various times during the marriage.

In August 1987, petitioner executed certain trusts, none of which are in dispute on appeal. The property in Maine was placed in a revocable trust with petitioner as settlor and trustee on October 30, 1987. Respondent signed a letter on October 30, 1987, whereby she acknowledged that the Maine property was being conveyed to a revocable trust for the primary benefit of their two children. The letter stated that the trust would provide that upon the sale of the property during respondent's lifetime she would receive 25% of the net proceeds. Respondent further acknowledged that she had an opportunity to review the Maine Trust before signing the letter and that she acknowledged and agreed that the Maine property would not be treated as marital property under the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 101 *et seq.*).

In the first issue, respondent contends that the manifest weight of the evidence proved that the waiver of her marital rights in the Maine property was the result of fraud, duress and coercion. She argues that the confidential relationship between a husband and wife required that the trial court strictly scrutinize the transaction, which it did not do. Respondent further claims that the Maine Trust was a fraud on her marital rights. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205.) We find that the manifest weight of the evidence proved that the Maine Trust was a fraud on respondent's marital rights. The facts pertinent to our decision are set forth therein.

In *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, the supreme court stated that the owner of property had an absolute right to dispose of the property during the owner's lifetime in any manner and may do so even if the transfer was for the precise purpose of minimizing

or defeating marital interests of the surviving spouse in the property. The transfer was not vulnerable to attack by the surviving spouse unless it was a sham and was "colorable" or "illusory" and tantamount to a fraud. The court noted that a fraud on the marital rights of the surviving spouse was not fraud in the traditional sense. "Intent to defraud" must be construed in connection with the words "illusory" and "colorable."

The *Johnson* court examined the trust created and found that, while the settlor retained a significant degree of control over the trust assets as trustee of a revocable trust, the form of control which the donor retained did not make the trust invalid. (*Johnson*, 73 Ill. 2d at 363.) The trust was not inoperable because the settlor had the power to revoke and retained a life interest in the trust property. However, *Johnson* went on to provide that the facts of a particular case may show the trust in question, while ostensibly valid, is in actuality a sham transaction. *Johnson*, 73 Ill. 2d at 364.

 Relying on *Johnson* and other cases, the supreme court found that fraud against marital property was not to be condoned even though it occurred before dissolution. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205; *In re Marriage of Glessner* (1983), 119 Ill. App. 3d 306.) When the characterization of a transfer of marital assets is questioned by a spouse, fraud is properly assessed by referring to the donative intent of the settlor. (*In re Marriage of Pahlke* (1987), 154 Ill. App. 3d 256.) An illusory transfer is one which takes back all that it gives, and a colorable transfer is one which appears absolute on its face, but due to some secret or tacit understanding between the transferee and the transferor, it is not a transfer because the parties intended ownership be retained by the transferor. (*Glessner*, 119 Ill. App. 3d at 315.) Whether the conveyance at issue was fraudulent depends upon all the circumstances surrounding the transfer. (*In re Marriage of Shehade* (1985), 137 Ill. App. 3d 692.) A fraud must be proven by clear and convincing evidence. (*Hofmann*, 94 Ill. 2d at 222.) A trial court's determination in this regard will be set aside only if it is against the manifest weight of the evidence. *Shehade*, 137 Ill. App. 3d at 701.

Respondent relies upon the fact that petitioner had the power to revoke, terminate, amend or modify the trust at anytime and had use of the property as long as he wanted to show the illusory nature of the transfer. However, under *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, these features do not necessarily render the trust inoperative. The facts surrounding the transfer show that the trust, while ostensibly valid, is in actuality a sham transaction to defraud respondent's marital rights. See *Hofmann*, 94 Ill. 2d 205; *Johnson*, 73 Ill. 2d 342.

Petitioner testified that he and respondent discussed their estate planning and the Maine property from early in 1987. Respondent denied this fact. The trial court as the trier of fact is in the superior position to determine the credibility of the witnesses, to weigh the evidence and to determine the preponderance thereof especially where the testimony is contradictory. (*In re Marriage of Dwan* (1982), 108 Ill. App. 3d 808.) However, other evidence also showed that only petitioner went to see John Buttita, of the law firm Altheimer and Gray, who drafted the various trust documents. Petitioner made all the arrangements for the distribution of the parties' assets, insurance, etc., and respondent had no direct input into the arrangements.

Under the initial trusts and petitioner's will executed on August 27, 1987, the Maine property, as an asset of petitioner's estate, would have poured into trusts set up for respondent and the children. Respondent would have had an interest in the Maine property. The Maine Trust set up in October 1987 removed that property from the will so that respondent would no longer have received any part of it. Petitioner testified that he changed the manner in which the Maine property was handled because he wanted to be certain his children would receive it. He was concerned about his children's interest in this regard because of conduct by respondent toward the children in the early-to-mid 1980s and her alcohol abuse. The evidence indicated, however, that petitioner was aware of these facts in August 1987, when he first provided for the Maine property.

Buttita testified that there were other ways to provide the children with the Maine property upon petitioner's death without respondent losing her marital rights in the property. He said that he did not recall discussing these with petitioner, although he also stated that he and petitioner did discuss the best way to handle the Maine property when petitioner contacted him regarding a change in the prior estate plans executed in August 1987.

The evidence showed that after petitioner executed the will and trusts on August 27, 1987, he saw an attorney on August 28, 1987, who later represented him in the dissolution proceeding. Petitioner testified that he was not contemplating divorce at that time, but wanted to have information on what would happen in the event of divorce. He stated that the Maine Trust was only done for estate planning purposes. Within a few weeks of this meeting, petitioner contacted Buttita regarding the Maine Trust. Buttita testified that he suspected problems between petitioner and respondent and spoke with a divorce attorney in his firm because of his concern with respondent's marital rights. He stated that he prepared the October 30, 1987, letter for respondent to

sign because divorce was an anticipated contingency for many of his clients. Buttita claimed that petitioner never told him that petitioner was contemplating a divorce, and Buttita did not know if there were going to be divorce proceedings. However, his October 29, 1987, letter to petitioner in which was enclosed the October 30, 1987, letter for respondent to sign, referred to the Maine property being excluded from marital property "at *the* divorce." (Emphasis added.) The letter also stated that "if *the* divorce proceedings become acrimonious," respondent could attempt to set aside the agreement. (Emphasis added.) This language indicates more than mere suspicion of a possible divorce.

Respondent was given the Maine Trust document to read, and she said that petitioner explained it to her. She was aware that she would receive 25% of the proceeds if the property was sold. Although she said she was not aware that a lawyer was advising petitioner and had drafted the letter, common sense would have told her that petitioner probably did not draft the trust document. (See generally *State Bank v. Sorenson* (1988), 167 Ill. App. 3d 674, 681.) On the other hand, petitioner testified that he did not tell respondent he had seen a divorce attorney in August 1987 because he was not contemplating divorce at that time. In addition to the visit to the divorce lawyer, the change in the trusts, and Buttita's letter, petitioner filed for dissolution in January 1988. We find that under these circumstances petitioner was being more than merely curious about the ramifications of dissolution and should have advised respondent of his consultation with a divorce attorney when he gave her the letter to sign.

Petitioner testified that when he gave respondent the October 30, 1987, letter to sign, she told him that she had a lawyer. Respondent did not have an attorney, however. Petitioner said he had previously told respondent that his lawyer and he were concerned about the Maine Trust being upset. He told respondent that if there was ever a problem with the marriage, *i.e.*, divorce, "one or the other" could challenge the trust and "somebody" could take back what they had already given. Petitioner wanted to be sure this did not occur because it was their mutual intent that the children have the property. He told respondent that by signing the letter the trust would be protected.

It is clear from petitioner's testimony that he misrepresented the true nature of the letter. Based upon Buttita's letter to petitioner, the October 30, 1987, letter to be signed by respondent was designed to protect the Maine Trust from any claim by respondent during a divorce. Petitioner would have no need to challenge the Maine Trust in a divorce. Yet, petitioner misrepresented to respondent that either one of them could challenge the trust and that the letter would protect the trust

from that occurring. He indicated by his explanation that the trust would have to be protected from him as well as her in the event of divorce. Regardless of any letter signed by respondent, petitioner had the power to revoke the trust.

Respondent had the letter about two weeks before she signed it and did not consult an attorney although she could have. Those cases in which coercion was found usually involved hastily contrived agreements occurring only hours before a hearing. (*In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 314.) However, respondent was laboring all that time under petitioner's misrepresentations regarding the purpose of the letter, and she was unaware of his visit with a divorce lawyer. She finally signed the letter after petitioner again told her that this was her opportunity to do something for the children, to which they both agreed.

■ The facts of this case show an intent to defraud respondent. The circumstances surrounding the trust and the trust provisions when viewed together show that the transfer was illusory and created to defeat respondent's marital rights to the property in a dissolution proceeding. Although she signed the agreement after it had been in her possession awhile, there was no consideration for the agreement. Petitioner misrepresented the nature of the letter. Respondent was unaware of petitioner's consultation with a divorce attorney. She had no attorney. The Maine Trust is set aside, and the matter is remanded in order that the Maine property be apportioned between the parties as the trial court deems proper in its discretion.

In the second issue, respondent asserts that the trial court erred in giving sole discretion to exercise the Hilton stock options to petitioner. She argues that petitioner may not act in her best interest or he may fail to exercise the options, thus leaving respondent with nothing. She asks that the trial court retain jurisdiction over the matter so that she may petition the trial court to compel petitioner to exercise her share of an option at her expense. Although petitioner points out that the stock options can only be exercised by him, respondent is not asking for the right to exercise the options directly or to have them transferred to her.

We initially note that, with the exception of two cases which are not on point with respect to the issue presented, respondent has provided no citation of authority to support her argument. (Petitioner has also failed to do so.) Bare contentions without citation of authority do not merit consideration on appeal. (*Britt v. Federal Land Bank Association* (1987), 153 Ill. App. 3d 605.) We have determined to address the issue on the merits despite this fact.

Petitioner was the recipient of certain stock options by virtue of his employment with the Hilton Hotels Corporation. He had vested unexer-

cised options for 6,772 shares of Hilton stock and nonvested unexercised options for another 11,000 shares. Under the stock option plan, petitioner's right to exercise an option was limited to a specific percentage of shares each year until the option fully vested. The options could not be transferred except by will or laws of descent and distribution, and only petitioner could exercise the options. The options expired at a certain time. If petitioner's employment terminated, the options expired within three months. The trial court retained jurisdiction to allocate 50% of any profit realized from the exercise of the vested options to each party and 50% of the marital fraction of any profit from the exercise of nonvested options to each party. Exercise of the options was in petitioner's discretion.

We are aware that the treatment of future benefits varies from jurisdiction to jurisdiction. (*In re Marriage of Evans* (1981), 85 Ill. 2d 523, 528-29.) The manners of distribution of stock options in dissolution cases are numerous. (Annot., 46 A.L.R.4th 640, 645 (1986).) For example, in *Callahan v. Callahan* (1976), 142 N.J. Super. 325, 361 A.2d 561, the court upheld a constructive trust on the husband in favor of the wife's 25% interest in options. The wife could direct him to exercise her share at her expense. The Missouri Court of Appeals upheld a distribution of one-half of certain stock options to each party with the husband retaining the right to decide to exercise the options. The wife was to be given 30 days' notice and had to pay for her portion. (*Smith v. Smith* (Mo. App. 1984), 682 S.W.2d 834.) In *Green v. Green* (1985), 64 Md. App. 122, 494 A.2d 721, the court found that the husband could not be compelled to exercise his stock options. However, the trial court could determine a percentage to each spouse by which the profits would be divided, if, as and when the options were exercised.

The method of distribution employed by the trial court herein is supported by *In re Marriage of Moody* (1983), 119 Ill. App. 3d 1043. In that case the husband was awarded his entire interest in certain stock options as part of an apportionment of marital property. The court had determined the value of the options as of the date of the hearing by taking judicial notice of the market value and calculating the profit. The husband argued that the options had no value until they were exercised, and the Appellate Court for the First District agreed. *Moody*, 119 Ill. App. 3d at 1047-48.

Relying on its interpretation of *In re Marriage of Evans* (1981), 85 Ill. 2d 523, the *Moody* court noted that an award of an interest in future benefits derived from one's employment was inappropriate under section 503 of the Act (Ill. Rev. Stat. 1981, ch. 40, par. 503), where the evidence presented did not establish the present value of the benefits.

The appellate court found it was improper for the trial court to take judicial notice of the market value of the stock, and there was insufficient evidence to support the valuation amount. *Moody*, 119 Ill. App. 3d at 1048.

The court went further, however, and found that it was impossible to value the options until they were exercised. The court examined the fact that the options were nontransferable and must be exercised to realize any profit. They had no value if they were never exercised. The husband had only 1,600 shares exercisable and not 3,000 under terms of the option plan. There was evidence that the husband's health and financial situation made it impossible for him to exercise the options without a loan and expenditure of a certain amount of money from his own sources. These factors established that the options may never be exercised before they expired. Thus, the options did not constitute property under section 503 until they were exercised. The trial court erred in apportioning the options to the husband. The husband was to retain his interests in the options as his separate property. The trial court was directed to retain jurisdiction until the options were exercised or expired. If they were exercised, the trial court, in its discretion, could allocate an appropriate share of any profit to each spouse. *Moody*, 119 Ill. App. 3d at 1047-48.

In the instant case, there was no evidence of the present value of the stock options to petitioner, and appropriately, the trial court did not attempt to value them. We also note many of the same features of the *Moody* stock options are present herein which show that the options have no value until and if they are exercised. While there was no evidence that petitioner may not be able to exercise the options due to poor health or financial reasons as there was in *Moody*, we do not find that the lack of these factors alone affects the fact that the value of the options cannot be properly valued until they are exercised.

■ The fact that the options could not be valued until such time as they were exercised indicates that, under *Evans* (85 Ill. 2d 523) and *Moody* (119 Ill. App. 3d 1043), the options did not constitute property under section 503 of the Act until they were exercised. (Ill. Rev. Stat. 1989, ch. 40, par. 503.) Thus, petitioner should retain his interest in the options as his separate property until such time as they are exercised. This fact was accomplished by the trial court's determination that petitioner have the sole discretion to exercise the options. The trial court also properly retained jurisdiction to allocate the profits realized from the exercise of the options. (*Moody*, 119 Ill. App. 3d at 1048.) While *Moody* provided that the trial court should allocate an appropriate share to each spouse at its discretion if and when the options were exercised,

we find no abuse of discretion with the trial court's determination now that such allocation will be 50% of any profit from the exercise of vested options and 50% of the marital fraction of any profit from the exercise of nonvested options to each party. Unlike *Moody*, neither spouse is being awarded an entire or majority interest in the options as a specific apportionment of marital property. Each spouse will share equally in any profit realized from the exercise of the options. There is no indication in the record or the judgment that the apportionment of marital property was affected in any manner by the determination to allocate the profits equally between the parties. We find no error in the trial court's treatment of the stock options, and petitioner properly retained the sole discretion to exercise them.

Next, respondent contends the trial court abused its discretion in the amount of maintenance it awarded. She claims that her monthly expenses totalled $4,710 and that income taxes on this amount of maintenance at 35.5% raised her monthly expenses to $6,382.05. Respondent argues that the award of $2,500 failed to take into consideration tax consequences, insurance obligations, debts, school expenses, and the lifestyle respondent enjoyed during her lengthy marriage.

The trial court is allowed to award maintenance in an amount it deems just after considering relevant factors such as: financial resources of the party seeking maintenance including marital property the party was apportioned; standard of living established during the marriage; duration of the marriage; age, physical and emotional condition of both parties; ability of other spouse to pay maintenance while meeting his needs; and the tax consequences of the property division. (Ill. Rev. Stat. 1989, ch. 40, par. 504(b); *In re Marriage of Swigers* (1988), 176 Ill. App. 3d 795, 802.) The trial court should also consider the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment. (*In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 633.) An award of maintenance is within the discretion of the trial court, and it will not be disturbed on review unless there is an abuse of discretion or the determination is against the manifest weight of the evidence. *In re Marriage of Wolf* (1989), 180 Ill. App. 3d 998, 1007-08.

Petitioner and respondent submitted affidavits of their expenses and income before the trial court, and neither party challenges these amounts. Although respondent states that she worked two part-time jobs, her affidavit fails to include any income. However, later testimony by her showed she was unemployed, and the trial court considered that fact in awarding maintenance. Respondent's affidavit does not indicate any debts.

■ While petitioner claims the trial court failed to consider certain factors, where the basis for an award of maintenance is established by the record, explicit findings regarding the statutory basis are not required. (*In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904; *In re Marriage of Coram* (1980), 86 Ill. App. 3d 845, 848.) Contrary to respondent's claim, the trial court specifically considered the life-style of the parties during the marriage. It also made express findings regarding some of the factors provided in section 504(b); however, it did not mention tax consequences. The trial court was not required to make an express finding on the tax consequences. (See *Weinberg*, 125 Ill. App. 3d at 916.) The record establishes a basis for the amount of the award, and we find no abuse of discretion occurred.

Respondent was unemployed at the time maintenance was awarded; however, she has an affirmative duty to try diligently to secure gainful employment. (*Wolf*, 180 Ill. App. 3d at 1008.) While petitioner earned a substantial income of over $218,000 per year, the trial court found that his net earnings were about $12,000 per month, as supported by the affidavit. Petitioner also had expenses, including those for the minor child and maintenance, which exceeded his monthly income. A party is entitled to maintenance not only on her own needs but also the comparative ability of the other party to pay. *In re Marriage of Rink* (1985), 136 Ill. App. 3d 252, 258.

Respondent also was apportioned marital property which must be considered in awarding maintenance. (*Mittra*, 114 Ill. App. 3d at 631.) After credit is given to petitioner for his reduction of the mortgage principal, respondent receives 50% of the net equity of the marital residence, which at the time of trial would be $109,000. (*Swigers*, 176 Ill. App. 3d at 803.) She was awarded one-half of petitioner's pension from which she will receive additional income when it becomes payable. *Swigers*, 176 Ill. App. 3d at 803.

The trial court further ordered petitioner to pay for the college expenses of the parties' daughter. This expense could be properly considered by the trial court in determining the amount of maintenance. (*Swigers*, 176 Ill. App. 3d at 802.) The record supports the amount of the award, and we find no abuse of discretion.

In the last issue, respondent argues that the trial court made an inequitable distribution of the personal property. She points to the personal property in the marital home as found in exhibit 24 and the fact that she was only awarded one set of china, her choice of silver or crystal and a Hummel figurine collection.

The trial court has broad discretion to make an equitable apportionment of marital property. (*In re Marriage of Zummo* (1988), 167 Ill.

App. 3d 566.) A court of review will not disturb that apportionment unless it can be clearly shown that the trial court abused its discretion. *In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320.

Respondent testified about certain pieces of art in the marital home, a collection of Hummel figurines, sterling silver, china, crystal, a bicycle and a chaise lounge which were acquired during the marriage. A list of other personal property in the home was admitted (exhibit 24) as was a list of personal property delivered to respondent by petitioner from the marital home (exhibit 23). Petitioner testified that he had delivered three truckloads of furniture and clothing to respondent and gave her $7,700 in cash for furniture. The trial court awarded each party the personal property in his or her respective possession and then awarded respondent one set of china to be selected by petitioner, silver or crystal to be selected by respondent, and the Hummel collection.

Specific findings of value may be required if they are necessary to provide a basis for the trial and reviewing courts to determine the propriety of the property division; however, an apportionment in kind need not be accompanied by an exact evaluation. (*In re Marriage of Hilkovitch* (1984), 124 Ill. App. 3d 401, 415-16.) There was testimony that respondent received personal property from the marital home as well as money from petitioner for furniture prior to the dissolution judgment. The trial court passed on the credibility of the witnesses in this respect. (*Zummo*, 167 Ill. App. 3d at 576-77.) While respondent claims the trial court compounded its error by allowing petitioner to choose the china, she in turn could select either the silver or crystal. On the basis of the record and the evidence before the trial court, we find no abuse of discretion in the division of personal property.

Based on the foregoing reasoning, the judgment of the circuit court is affirmed in part, and the cause is remanded to permit the trial court to allocate the Maine property as it deems proper.

Affirmed in part; reversed in part and remanded.

McLAREN and DUNN, JJ., concur.