Joan G. **HEAD**, Appellant,

v.

Howard **HEAD**, Appellee.

No. 84–1116.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1985.

Decided April 24, 1985.

---

Gary I. Strausberg and Kenneth D. Pack, Baltimore, Md. (Melnicove, Kaufman, Weiner & Smouse, P.A., Baltimore, Md., on brief), for appellant.

Melvin J. Sykes, Baltimore, Md. (Max R. Israelson, Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge.

Joan Head appeals from an order of the United States District Court for the District of Maryland granting summary judgment in favor of her ex-husband, Howard Head, in her claims against him for alleged violation of anti-fraud provisions of the federal securities law in their property settlement agreement. We now affirm the judgment of the district court.

I

Joan and Howard Head were married on June 11, 1968. Howard had children by a previous marriage, so the couple entered into an antenuptial agreement that limited Joan's access to Howard's considerable wealth in the event of death or divorce. Howard's wealth increased substantially during the marriage due to his invention of the Prince tennis racket and his ownership of the company that manufactured and marketed the racket, Prince Manufacturing Incorporated (PMI).

On September 24, 1981, Joan filed for divorce *a mensa et thoro* in Maryland state court. After several months of negotiations the lawyers for the respective parties worked out a property settlement agreement that was signed by the parties on December 30, 1981. During the negotiations Howard relied on the 1968 antenuptial agreement and Joan disputed the validity of the agreement. Howard also produced for Joan's lawyers financial statements from his accountants that listed the book value of Howard's PMI stock as being $2,551,000. Both parties recognized that this reported figure was considerably lower than the stock's fair market value.

In the December 1981 property settlement Joan released any claim she might have had against Howard in exchange for $1,525,000, with $1,025,000 payable immediately, and $500,000 payable on or before February 16, 1982. The $500,000 obligation was evidenced by a promissory note from Howard to Joan and secured by 25,000 shares of PMI stock placed in escrow with Joan's lawyer. In due time Howard satisfied the obligation and the escrowed stock was returned to him.

In June of 1982, approximately four months after Howard satisfied his property settlement obligations, Howard sold all of his PMI stock to the Chesebrough-Ponds corporation for $45,000,000.

Shortly thereafter Joan brought this action in the United States District Court for the District of Maryland alleging that the December 1981 property settlement constituted a fraudulently induced "sale" of her alleged interest in the PMI shares in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; and section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q.

Howard moved for summary judgment on the grounds that Joan had no standing to assert her federal securities claims. The district court granted summary judgment, reasoning that Joan Head had no interest in the PMI stock itself under the Maryland Marital Property Act, Md.Cts. & Jud.Proc.

Code Ann. § 3–6A–01, et seq., and therefore failed to satisfy the federal standing requirements set forth in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The district court also rejected Joan's alternative claim that the stock escrow portion of the property settlement constituted a fraudulently-induced purchase of the pledged stock. This appeal followed.

## II

In *Blue Chip*, the Supreme Court held that only actual purchasers and sellers of securities have standing to pursue private actions under the anti-fraud provisions of the federal Securities Exchange Act of 1934. *See also Gurley v. Documation, Inc.*, 674 F.2d 253 (4th Cir.1982) (applying *Blue Chip* standing test). Under that test, we conclude with the district court that Joan was not, by virtue of the December 1981 property settlement, a seller of PMI shares, and that she therefore lacked standing to sue under Rule 10b–5. Under relevant state law she then had no recognizable property interest in that stock.

The Maryland Marital Property Act defined marital property as

> [A]ll property, however titled, acquired by either or both spouses during their marriage. It does not include property acquired prior to the marriage, property acquired by inheritance or gift from a third party, or property excluded by valid agreement or property directly traceable to any of these sources.

Md.Cts. & Jud.Proc. Code Ann. § 3–6A–01(e) (repealed in 1984 and recodified in substantially identical form as Md. Fam.Law Code Ann. §§ 8–201–213). Under the Act a Maryland court granting a divorce or annulment was authorized to resolve any dispute between the spouses with respect to ownership of marital property. However, Maryland's statute was "unique among those of other states in that the chancellor is given no authority to transfer title to marital property under the Act." *Deering v. Deering*, 292 Md. 115, 437 A.2d 883, 891 n. 9 (1981). Instead, under § 3–

6A–05 the Maryland court was authorized to determine the total value of the marital property and then, in consideration of nine equitable factors, to grant a discretionary cash award to the less pecunious spouse.

The result was that the less pecunious spouse in Maryland did not have a property interest in property to which the wealthier spouse held title. At most the less pecunious spouse had but an intangible expectancy in a share of the marital property's total cash value. *Grant v. Zich*, 53 Md.App. 610, 456 A.2d 75 (1983).

■ Howard Head alone held title to the PMI stock. While Howard Head's PMI stock might therefore have become "marital property" for the purposes of the Maryland statute, the district court was correct in finding that under the controlling state statute Joan Head had no interest in those particular securities that was sufficiently identifiable to make the December 1981 property settlement a "sale" of securities and thereby to make Joan Head a "seller" of shares for the purposes of the federal securities laws. The district court was therefore correct in its conclusion that Joan Head lacked standing under *Blue Chip* to maintain this action as a seller of shares.

## III

Joan Head asserts as an alternative, independent basis for standing the pledge of PMI stock by Howard Head to secure his $500,000 debt to Joan under the December 1981 property settlement. Joan argues that the pledge itself was a "sale" as to which she was a purchaser and as to which Howard's alleged fraud as to his net worth was "in connection" for the purposes of the federal securities laws. We also disagree with this contention.

In *Rubin v. United States*, 449 U.S. 424, 431, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1981), the Court determined that a pledge of stock was a "sale" for the purposes of § 17(a) of the Securities Act of 1933, and that the anti-fraud provision therefore applied to the pledge transaction. In *Marine Bank v. Weaver*, 455 U.S. 551, 554 n. 2, 102

S.Ct. 1220, 1222 n. 2, 71 L.Ed.2d 409 (1982), the Court construed *Rubin* to hold that a pledge of a security was likewise a "sale" for the anti-fraud purposes of § 10(b) of the Securities Exchange Act of 1934, but reversed the lower court on the grounds that the certificate of deposit at issue was not a "security" under the Act.

While the pledge transaction part of the December 1981 property settlement here in issue might therefore be considered a "sale" of a security, Joan has failed to demonstrate any fraud "in connection with" that "sale" as required by Rule 10b–5.[1] Joan relies on *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), and its *"de minimis* touch test" as support for her contention that any alleged fraud by Howard in the representation of the value of his PMI shares was sufficiently "in connection with" the "sale" to her of the shares in the escrow agreement, to make the transaction actionable under Rule 10b–5. The *Bankers Life "de minimis* touch test" might be read literally and expansively to make any securities transaction actionable under Rule 10b–5 so long as there was some deceptive practice remotely "touching" the transaction. Note, *The Pendulum Swings Farther: The "In Connection With" Requirement and Pretrial Dismissals of Rule 10b–5 Private Claims for Damages*, 56 Texas L.Rev. 62, 66–67 (1977). But we think the test could not have been intended to be applied in so unlimited a way.

In *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir.1984), Judge Friendly suggested the more limited application we think proper in a case quite similar to ours. In *Chemical Bank* a group of creditors sued an accounting firm under Rule 10b–5 for alleged misrepresentations by the firm as to the debtor company's financial health that induced the creditors to lend to the debtor. The creditors claimed standing under Rule 10b–5 on the basis of a pledge of the debtor's stock as security for one of the loans, although there had been no misrepresentation as to the value of the pledged collateral. Reviewing the district court's refusal to dismiss for failure to state a Rule 10b–5 claim, the Second Circuit set what we agree are proper limits on the *"de minimis* touch test."

First noting that the Supreme Court in *Rubin* had expressly reserved the question of whether misrepresentations not pertaining to the securities themselves can give rise to an action under the anti-fraud provisions of the federal securities law, 449 U.S. 424, 429 n. 6, 101 S.Ct. 698, 701 n. 6, 66 L.Ed.2d 633 the *Chemical Bank* court answered that question in the negative. Then observing that *Bankers Life* had "pushed the perimeters rather far" on Rule 10b–5 liability, the Second Circuit held that "the Act and Rule impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." 726 F.2d at 943. *Accord Ketchum v. Green*, 557 F.2d 1022 (3d Cir.1977), *cert. denied* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977).

Like the *Chemical Bank* creditors, Joan Head attempts to satisfy the essential elements of a Rule 10b–5 action by simply linking the "sale" in the escrow transaction to alleged fraud in the prior property settlement. But, as with the *Chemical Bank*

---

1. Rule 10b–5 provides:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
   
   (a) To employ any device, scheme, or artifice to defraud,
   
   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   
   (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
   
   17 C.F.R. § 240.10b–5.

creditors, she fails to allege that the proscribed act, fraudulent misrepresentation, occurred "in connection with" the pledge of collateral which on her theory is the sale of securities upon which her standing rests under *Blue Chip*.

██ Joan Head received precisely what she bargained for in the escrow agreement. There was no misrepresentation as to the value of the stock pledged as security for Howard's $500,000 obligation to her. The bargained-for collateral was sufficient to cover the debt, and the debt was in fact paid off and the collateral returned to Howard Head.

We agree with the Second Circuit's holding that such a pledge of securities will not support a cause of action under the antifraud provisions of the federal securities law. On this basis we affirm the district court's dismissal of that claim.

## IV

In view of our holding that there was no sale of securities in respect of the December 1981 property settlement, and that any fraud as alleged was not "in connection with" the contemporaneous pledge of stock treated as a "sale" for Rule 10b–5 purposes, it is not necessary to address Howard's further contention that the issue of fraud has been preclusively established against Joan by a Maryland state court determination of that issue in the divorce proceedings.

AFFIRMED.